## CONNECTICUT GENERAL LIFE INSURANCE CO. *v.* JOHNSON, TREASURER OF CALIFORNIA.

No. 316.   Argued January 14, 1938.—Decided January 31, 1938.

*Messrs. William Marshall Bullitt* and *B. M. Anderson,* with whom *Mr. Raymond Benjamin* was on the brief, for appellant.

*Mr. Neil Cunningham,* Deputy Attorney General, with whom *Mr. U. S. Webb,* Attorney General, of California, was on the brief, for appellee.

Mr. Justice Stone delivered the opinion of the Court.

Appellant is a Connecticut corporation, admitted to do an insurance business in California. In addition to its business conducted within that state it has entered into contracts with other insurance corporations likewise licensed to do business in California, reinsuring them against loss on policies of life insurance effected by them in California and issued to residents there. These reinsurance contracts were entered into in Connecticut where the premiums were paid and where the losses, if any, were payable. The question for decision is whether a tax laid by California on the receipt by appellant in Connecticut of the reinsurance premiums during the years 1930 and 1931, infringes the due process clause of the Fourteenth Amendment.

In suits brought in the state court by appellant against respondent, state treasurer, to recover the taxes paid, the Supreme Court of California sustained demurrers to the complaints and gave judgments for the respondent. The cases, having been consolidated, come here on a single appeal under § 237 (a) of the Judicial Code. 28 U. S. C. § 344 (a).

Section 14 of Art. XIII of the California constitution, as supplemented by Act of March 5, 1921 (Stats. 1921, c. 22, pp. 20, 21, Political Code, § 3664b), fixing the rate of tax, lays upon every insurance company doing business within the state an annual tax of 2.6% "upon the amount of the gross premiums received upon its business done in this state, less return premiums and reinsurance in companies or associations authorized to do business in this state. . . ." The Supreme Court of California has declared that the constitutional provision imposes

"a franchise tax exacted for the privilege of doing business" in the state. *Consolidated Title Securities Co.* v. *Hopkins*, 1 Cal. (2d) 414, 419; 35 P. (2d) 320; cf. *Carpenter* v. *People's Mutual Life Insurance Co.*, 94 Cal. Dec. 674; 74 P. (2d) 708.

Although in terms the "gross premiums received upon . . . business done in this state," less the specified deductions, are made the measure of the tax, the state court in this, as in an earlier case, *Connecticut General Life Insurance Co.* v. *Johnson*, 3 Cal. (2d) 83; 43 P. (2d) 278 (appeal dismissed for want of a properly presented federal question, 296 U. S. 535), has held that the measure includes the premiums on appellant's reinsurance policies effected and payable in Connecticut. In this case it has declared also that the policy of the state, expressed in the constitutional provision, is "to avoid double taxation without any loss of revenue to the state." To accomplish that end the deduction of reinsurance premiums paid to companies authorized to do business within the state is allowed, it is said, on the theory that the benefit of the deduction will be passed on to the reinsurer who, being authorized to do business within the state, may be taxed on the reinsurance premiums as a means of equalizing the tax and as an offset against the benefit of the deduction which he ultimately enjoys.

No contention is made that appellant has consented to the tax imposed as a condition of the granted privilege to do business within the state. Nor could it be, for it appears that appellant had conducted its business in California under state license for many years before the taxable years in question and before the taxing act was construed by the highest court of the state, in *Connecticut General Life Insurance Co.* v. *Johnson, supra*, to apply to premiums received in Connecticut from reinsurance contracts effected there. A corporation which is allowed to come into a state and there carry on its business may

claim, as an individual may claim, the protection of the Fourteenth Amendment against a subsequent application to it of state law. *Hanover Fire Insurance Co.* v. *Harding,* 272 U. S. 494; cf. *Kentucky Finance Corp.* v. *Paramount Auto Exchange Corp.,* 262 U. S. 544.

It is said that the state could have lawfully accomplished its purpose if the statute had further stipulated that the deduction should be allowed only in those cases where the reinsurance is effected in the state or the reinsurance premiums paid there. But as the state has placed no such limitation on the allowance of deductions, the end sought can be attained only if the receipt by appellant of the reinsurance premiums paid in Connecticut upon the Connecticut policies is within the reach of California's taxing power. Appellee argues that it is, because the reinsurance transactions are so related to business carried on by appellant in California as to be a part of it and properly included in the measure of the tax; and because, in any case, no injustice is done to appellant since the effect of the statute as construed is to redistribute the tax, which the state might have exacted from the original insurers but did not, by assessing it upon appellant to the extent to which it has received the benefit of the allowed deductions.

But the limits of the state's legislative jurisdiction to tax, prescribed by the Fourteenth Amendment, are to be ascertained by reference to the incidence of the tax upon its objects rather than the ultimate thrust of the economic benefits and burdens of transactions within the state. As a matter of convenience and certainty, and to secure a practically just operation of the constitutional prohibition, we look to the state power to control the objects of the tax as marking the boundaries of the power to lay it. Hence it is that a state which controls the property and activities within its boundaries of a foreign corporation admitted to do business there may tax them. But the due process clause denies to the state

power to tax or regulate the corporation's property and activities elsewhere. *Union Refrigerator Transit Co.* v. *Kentucky,* 199 U. S. 194; *New York Life Insurance Co.* v. *Head,* 234 U. S. 149; *New York Life Insurance Co.* v. *Dodge,* 246 U. S. 357; *St. Louis Compress Co.* v. *Arkansas,* 260 U. S. 346; *Compañia General De Tabacos* v. *Collector,* 275 U. S. 87; *Home Insurance Co.* v. *Dick,* 281 U. S. 397; *Hartford Accident & Indemnity Co.* v. *Delta & Pine Land Co.,* 292 U. S. 143; *Boseman* v. *Connecticut General Life Ins. Co.,* 301 U. S. 196; *People ex rel. Sea Insurance Co.* v. *Graves,* 274 N. Y. 312; 8 N. E. (2d) 872; cf. *Provident Savings Life Assurance Society* v. *Kentucky,* 239 U. S. 103. It follows that such a tax, otherwise unconstitutional, is not converted into a valid exaction merely because the corporation enjoys outside the state economic benefits from transactions within it, which the state might but does not tax, or because the state might tax the transactions which the corporation carries on outside the state if it were induced to carry them on within.

Appellant, by its reinsurance contracts, undertook only to indemnify the insured companies against loss upon their policies written in California. The reinsurance involved no transactions or relationship between appellant and those originally insured, and called for no act in California. *Connecticut General Life Insurance Co.* v. *Johnson, supra,* 87; cf. *Morris & Co.* v. *Skandinavia Insurance Co.,* 279 U. S. 405, 408. Apart from the facts that appellant was privileged to do business in California, and that the risks reinsured were originally insured against in that state by companies also authorized to do business there, California had no relationship to appellant or to the reinsurance contracts. No act in the course of their formation, performance or discharge, took place there. The performance of those acts was not dependent upon any privilege or authority granted by it, and California laws afforded to them no protection.

The grant by the state of the privilege of doing business there and its consequent authority to tax the privilege do not withdraw from the protection of the due process clause the privilege, which California does not grant, of doing business elsewhere. *Western Union Telegraph Co.* v. *Kansas,* 216 U. S. 1; *International Paper Co.* v. *Massachusetts,* 246 U. S. 135; *Louisville & Jeffersonville Ferry Co.* v. *Kentucky,* 188 U. S. 385, 398. Even though a tax on the privilege of doing business within the state in insuring residents and risks within it may be measured by the premiums collected, including those mailed to the home office without the state, *Equitable Life Assurance Society* v. *Pennsylvania,* 238 U. S. 143, and though the writing of policies without the state insuring residents and risks within it is taxable because within the granted privilege, *Compañia General De Tabacos* v. *Collector, supra,* 98, there is no basis for saying that reinsurance which does not run to the original insured, and which from its inception to its termination involves no action taken within California, even the settlement and adjustment of claims, is embraced in any privilege granted by that state. *Provident Savings Life Assurance Society* v. *Kentucky, supra,* 112; *Compañia General De Tabacos* v. *Collector, supra,* 96; cf. *Equitable Life Assurance Society* v. *Pennsylvania, supra,* 147; *Compañia General De Tabacos* v. *Collector, supra,* 98. All that appellant did in effecting the reinsurance was done without the state and for its transaction no privilege or license by California was needful. The tax cannot be sustained either as laid on property, business done, or transactions carried on within the state, or as a tax on a privilege granted by the state.

*Reversed.*

MR. JUSTICE CARDOZO took no part in the consideration or decision of this case.

MR. JUSTICE BLACK, dissenting.

I do not believe that this California corporate franchise tax has been proved beyond all reasonable doubt to be in violation of the Federal Constitution [1] and I believe that the judgment of the Supreme Court of California should be affirmed. Traditionally, states have been empowered to grant or deny foreign corporations the right to do business within their borders,[2] and ". . . may exclude them arbitrarily or impose such conditions as . . . (they) will upon their engaging in business within (their) . . . jurisdiction." [3]

California laid an annual tax upon gross insurance premiums which the Supreme Court of California has construed to be "a franchise tax exacted for the privilege of doing business." In measuring this franchise tax imposed upon corporations the state includes reinsurance premiums paid to the corporation on contracts made without the state, *where such reinsurance protects citizens of the State of California.* There is no attempt by this tax to regulate the business of the insurance company in any state except California.

The record does not indicate that California made any contract with this Connecticut corporation guaranteeing it a permanent franchise to do business in California on the same terms and conditions upon which it entered the state.

"A state which freely granted the corporate privilege for intrastate commerce may change its policy. . . . in the absence of contract, there is no vested interest which requires the continuance of a legislative policy however

---

[1] Cf. *Ogden* v. *Saunders,* 12 Wheat. 213, 270.

[2] *Bank of Augusta* v. *Earle,* 13 Pet. 519; *Paul* v. *Virginia,* 8 Wall. 168; *Ducat* v. *Chicago,* 10 Wall. 410; *Horn Silver Mining Co.* v. *New York,* 143 U. S. 305.

[3] *Hanover Fire Ins. Co.* v. *Harding,* 272 U. S. 494, 507.

84

expressed—whether embodied in a charter or in a system of taxation." [4]

It may be that California believes that by this tax it can stimulate the reinsurance business of companies making their reinsurance contracts in California. The right of a state to foster its own domestic industries by its taxing system has been sustained by this Court. [5]

This Court has also frequently sustained the right of a state to impose conditions on foreign corporations in order to favor its own corporations. [6] If a state did not have this privilege it could not protect the domestic business of its own corporations from undesirable competition by foreign corporations. The State of California has the constitutional right to limit the privileges of its own corporations and to reserve the right to control their privileges and to define and limit their activities. [7] If California has the lawful constitutional right (as this Court has many times said it has) to impose conditions upon foreign corporations so as to protect domestic corporations, its own elected legislative representatives should be the judges of what is reasonable and proper in a democracy.

With reference to a corporate tax imposed by the State of Louisiana, this Court has said: "The appellants, by incorporating in some other state, or by spreading their business and activities over other states, cannot set at naught the public policy of Louisiana [California?]. . . . The policy Louisiana [California?] is free to adopt with

[4] Brandeis, J., dissenting, *Liggett Co.* v. *Lee*, 288 U. S. 517, 546.

[5] *New York* v. *Roberts*, 171 U. S. 658; *Magnano Co.* v. *Hamilton*, 292 U. S. 40; *Fox* v. *Standard Oil Co.*, 294 U. S. 87; *Aero Mayflower Transit Co.* v. *Georgia Commission*, 295 U. S. 285; *Alaska Fish Co.* v. *Smith*, 255 U. S. 44, 48.

[6] *Prudential Insurance Co.* v. *Cheek*, 259 U. S. 530, 536; *Pembina Mining Co.* v. *Pennsylvania*, 125 U. S. 181, 189.

[7] *Fifth Avenue Coach Co.* v. *New York*, 221 U. S. 467; *Stone* v. *Mississippi*, 101 U. S. 814, 820.

respect to the business activities of her own citizens she may apply to the citizens of other states who conduct the same business within her borders, and this irrespective of whether the evils requiring regulation arise solely from operations in Louisiana [California?] or are in part the result of extra-state transactions." [8]

But it is contended that the due process clause of the Fourteenth Amendment prohibits California from determining what terms and conditions should be imposed upon this Connecticut corporation to promote the welfare of the people of California.

I do not believe the word "person" in the Fourteenth Amendment includes corporations. "The doctrine of stare decisis, however appropriate and even necessary at times, has only a limited application in the field of constitutional law." [9] This Court has many times changed its interpretations of the Constitution when the conclusion was reached that an improper construction had been adopted.[10] Only recently the case of *West Coast Hotel Co.* v. *Parrish,* 300 U. S. 379, expressly overruled a previous interpretation of the Fourteenth Amendment which had long blocked state minimum wage legislation. When a statute is declared by this Court to be unconstitutional, the decision until reversed stands as a barrier against the adoption of similar legislation. A constitutional interpretation that is wrong should not stand. I believe this Court should now overrule previous decisions which interpreted the Fourteenth Amendment to include corporations.

Neither the history nor the language of the Fourteenth Amendment justifies the belief that corporations are in-

[8] *Atlantic & Pac. Tea Co.* v. *Grosjean.* 301 U. S. 412, 427.

[9] Stone and Cardozo, JJ., concurring, *St. Joseph Stock Yards Co.* v. *United States,* 298 U. S. 38, 94.

[10] See collection of cases, Notes 1, 2, 3 and 4, Dissenting Opinion of Justice Brandeis, *Burnet* v. *Coronado Oil & Gas Co.,* 285 U. S. 393, 406–409.

cluded within its protection. The historical purpose of the Fourteenth Amendment was clearly set forth when first considered by this Court in the *Slaughter House Cases,* 16 Wall. 36, decided April, 1873—less than five years after the proclamation of its adoption. Mr. Justice Miller speaking for the Court said (p. 70):

"Among the first acts of legislation adopted by several of the States in the legislative bodies which claimed to be in their normal relations with the Federal government, were laws which imposed upon the colored race onerous disabilities and burdens, and curtailed their rights in the pursuit of life, liberty, and property to such an extent that their freedom was of little value, while they had lost the protection which they had received from their former owners from motives both of interest and humanity. . . .

"These circumstances, whatever of falsehood or misconception may have been mingled with their presentation, forced . . . the conviction that something more was necessary in the way of constitutional protection to the unfortunate race who had suffered so much. . . . [Congressional leaders] accordingly passed through Congress the proposition for the *fourteenth amendment, and . . . declined to treat as restored to their full participation in the government of the Union the States which had been in insurrection,* until they ratified that article by a formal vote of their *legislative bodies.*"

Certainly, when the Fourteenth Amendment was submitted for approval, the people were not told that the states of the South were to be denied their normal relationship with the Federal Government unless they ratified an amendment granting new and revolutionary rights to corporations. This Court, when the *Slaughter House Cases* were decided in 1873, had apparently discovered no such purpose. The records of the time can be searched in vain for evidence that this Amendment was adopted for the benefit of corporations. It is true

that in 1882, twelve years after its adoption, and ten years after the *Slaughter House Cases, supra,* an argument was made in this Court that a journal of the joint Congressional Committee which framed the Amendment, secret and undisclosed up to that date, indicated the Committee's desire to protect corporations by the use of the word "person." [11]  Four years later, in 1886, this Court in the case of *Santa Clara County* v. *Southern Pacific Railroad,* 118 U. S. 394, decided for the first time that the word "person" in the Amendment did in some instances include corporations.  A secret purpose on the part of the members of the Committee, even if such be the fact, however, would not be sufficient to justify any such construction.  The history of the Amendment proves that the people were told that its purpose was to protect weak and helpless human beings and were not told that it was intended to remove corporations in any fashion from the control of state governments.  The Fourteenth Amendment followed the freedom of a race from slavery.  Justice Swayne said in the *Slaughter House Cases, supra,* that "by 'any person' was meant *all* persons within the jurisdiction of the State.  No distinction is intimated on account of race or color."  Corporations have neither race nor color.  He knew the Amendment was intended to protect the life, liberty and property of *human* beings.

The language of the Amendment itself does not support the theory that it was passed for the benefit of corporations.

The first clause of § 1 of the Amendment reads: "All *persons* born or naturalized in the United States and sub-

---

[11] *San Mateo County* v. *Southern Pacific Railroad,* 116 U. S. 138. See Benj. B. Kendrick, Journal of the Joint Committee on Reconstruction (1914, New York); Howard J. Graham, The "Conspiracy Theory" of the Fourteenth Amendment, 47 Yale L. J. 371; Donald Barr Chidsey, The Gentleman from New York—A Life of Roscoe Conklin, Yale University Press (1935).

ject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside." Certainly a corporation cannot be naturalized and "persons" here is not broad enough to include "corporations."

The first clause of the second sentence of § 1 reads: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; . . ." While efforts have been made to persuade this Court to allow corporations to claim the protection of *this* clause, these efforts have not been successful.[12]

The next clause of the second sentence reads: "nor shall any State deprive any *person* of life, liberty or property without due process of law; . . ." It has not been decided that this clause prohibits a state from depriving a corporation of "life." This Court has expressly held that "the liberty guaranteed by the Fourteenth Amendment against deprivation without due process of law is the liberty of *natural, not artificial persons*."[13] Thus, the words "life" and "liberty" do not apply to corporations, and of course they could not have been so intended to apply. However, the decisions of this Court which the majority follow hold that corporations are included in this clause insofar as the word "property" is concerned. In other words, this clause is construed to mean as follows:

"Nor shall any State deprive any *human being* of life, liberty or property without due process of law; nor shall any State deprive any corporation of property without due process of law."

The last clause of this second sentence of § 1 reads: "nor deny to any person within its jurisdiction the equal protection of the laws." As used here, "person" has been construed to include corporations.[14]

---

[12] *Selover, Bates & Co.* v. *Walsh,* 226 U. S. 112, 126.

[13] *Western Turf Assn.* v. *Greenberg,* 204 U. S. 359, 363.

[14] *Gulf, C. & S. F. Ry. Co.* v. *Ellis,* 165 U. S. 150, 154.

Both Congress and the people were familiar with the meaning of the word "corporation" at the time the Fourteenth Amendment was submitted and adopted. The judicial inclusion of the word "corporation" in the Fourteenth Amendment has had a revolutionary effect on our form of government. The states did not adopt the Amendment with knowledge of its sweeping meaning under its present construction. No section of the Amendment gave notice to the people that, if adopted, it would subject every state law and municipal ordinance, affecting corporations, (and all administrative actions under them) to censorship of the United States courts. No word in all this Amendment gave any hint that its adoption would deprive the states of their long recognized power to regulate corporations.

The second section of the Amendment informed the people that representatives would be apportioned among the several states "according to their respective numbers, counting the whole number of *persons* in each State, excluding Indians not taxed." No citizen could gather the impression *here* that while the word "persons" in the second section applied to human beings, the word "persons" in the first section *in some instances* applied to corporations. Section 3 of the Amendment said that "no *person* . . . shall be a Senator or Representative in Congress," (who "engaged in insurrection"). There was no intimation *here* that the word "person" in the first section *in some instances* included corporations.

This Amendment sought to prevent discrimination by the states against classes or races. We are aware of this from words spoken in this Court within five years after its adoption, when the people and the courts were personally familiar with the historical background of the Amendment. "We doubt very much whether any action of a State not directed by way of discrimination against

the negroes as a class, or on account of their race, will ever be held to come within the purview of this provision." [15] Yet, of the cases in this Court in which the Fourteenth Amendment was applied during the first fifty years after its adoption, less than one-half of one per cent. invoked it in protection of the negro race, and more than fifty per cent. asked that its benefits be extended to corporations.[16]

If the people of this nation wish to deprive the States of their sovereign rights to determine what is a fair and just tax upon corporations doing a purely local business within their own state boundaries, there is a way provided by the Constitution to accomplish this purpose. That way does not lie along the course of judicial amendment to that fundamental charter. An Amendment having that purpose could be submitted by Congress as provided by the Constitution. I do not believe that the Fourteenth Amendment had that purpose, nor that the people believed it had that purpose, nor that it should be construed as having that purpose.

I believe the judgment of the Supreme Court of California should be sustained.

---

[15] *Slaughter House Cases, supra.*

[16] Charles Wallace Collins, The Fourteenth Amendment and the States, Boston (1912), p. 138.