## Commonwealth v. Millers Mutual Fire Insurance Co.

*Rhoads, Sinon & Reader* and *Nicholas S. Kiefer*, for appellant.

. . *Thomas D. McBride*, Attorney General, and *Ralph S. Snyder*, Deputy Attorney General, for Commonwealth.

KREIDER, J., December 30, 1957.—This is an appeal by the Millers Mutual Fire Insurance Company, a Pennsylvania corporation, without capital stock, whose principal place of business is in Harrisburg, Dauphin County. It appeals from the settlement of tax made against it for the year ended December 31, 1954, in the amount of $949.56 on gross premiums paid by it on reinsurance contracts to foreign insurance companies unauthorized to do business in Pennsylvania. It also appeals from the decision of the Board of Finance and Revenue refusing defendant's petition for review. A stipulation of facts and subsequently an additional stipulation of facts were filed. The matter is now before the court after argument on the said stipulations.

### Relevant Facts

Defendant appellant is engaged in the business of insuring property against loss from fire and allied risks. During the calendar year 1954, defendant reinsured a portion of its risks physically located in Pennsylvania with two foreign insurance companies, not registered or entitled to do business in this Commonwealth, under three contracts of *reinsurance* as authorized by section 319 of The Insurance Company Law of May 17, 1921, P. L. 682, 40 PS §442. One of these contracts was between defendant and Farmers Mutual Alliance Insurance Company of McPherson, Kan.

It is stipulated that this contract is a Kansas contract and became a binding obligation upon the parties upon execution by the president of the latter company in the State of Kansas and that all acts in the performance of the contract as well as notice of losses and payment of losses occurred at the office of Farmers Mutual Alliance Insurance Company in Kansas. The remaining two contracts of reinsurance were made by defendant with The Underwriters at Lloyd's, London. They were negotiated by brokers located in Philadelphia, but were signed by Lloyd's policy-signing office in London and are English contracts. Neither of the reinsurers with whom reinsurance was effected maintains any office in Pennsylvania nor does it have employes in Pennsylvania.

### Statute Involved

The statute involved is the Tax on Contracts with Unauthorized Companies Act of July 6, 1917, P. L. 723, 72 PS §§2265-2266. It is the position of defendant insurance company that the settlement made against it is void, inasmuch as the Act of 1917 and the action of the Department of Revenue in pursuance

thereof are invalid under the due process and the equal protection clauses of the Fourteenth Amendment to the United States Constitution and article I, sec. 9, of the Constitution of Pennsylvania and because the Act of 1917 cannot be construed to impose a tax on the making of contracts for reinsurance with insurance companies which are not authorized to do business in Pennsylvania. Section 1 of the Act of July 6, 1917, P. L. 723, 72 PS §§2265-2266, supra, provides as follows:

"Section 1. Be it enacted &c., That whenever any person, corporation, copartnership, or association enters into any contract of insurance or reinsurance of any kind with any insurance company or association of another State or of a foreign country, not registered or entitled to do business in this Commonwealth, such person, corporation, copartnership, or association shall, at the time of making such contracts and at the time of making any periodical payment, deduct from all premiums on such insurance or reinsurance a per centum thereof equal to the per centum tax imposed on the premiums of insurance companies and associations of other States and of foreign countries that are registered and entitled to do business in this Commonwealth, and shall forthwith pay such amount into the State Treasury.

"Any person, corporation, copartnership, or association failing to make such deduction and payment into the State Treasury shall be liable for the amount of such tax, with interest at the rate of twelve per centum per annum, to be collected in the same manner as other taxes of the Commonwealth are collected."

The original purpose of the legislature in enacting the Act of 1917 is succinctly stated in the first edition of Stradley and Krekstein's Corporate Taxation and

Procedure in Pennsylvania (1942) in vol. 2, §425, at pages 136, 137, as follows:

"The Tax on Contracts with Unauthorized Companies, more commonly known as the Tax on Unauthorized Contracts, affects contracts of insurance negotiated with companies which are not registered to conduct an insurance business within the Commonwealth. If the insurance company is registered in the state, the Gross Premiums Tax or the Underwriting Profits Tax is collectible with respect to Pennsylvania contracts and the Tax on Unauthorized Contracts is inapplicable.

"Many contracts of insurance are negotiated by residents of Pennsylvania with companies which are not registered or admitted to do business in the Commonwealth, notwithstanding the absence of safeguards required of registered companies by the Commonwealth. For example, since these companies have not authorized acceptance of service, beneficiaries may be prevented from prosecuting suits for damages in Pennsylvania. Furthermore, such companies have not submitted financial statements establishing the adequacy of assets and reserves to meet the claims of policyholders. Thus, by failing to register and pay the Gross Premiums Tax upon business written in the state, an unauthorized insurance company obtains a competitive advantage over registered companies. The Tax on Unauthorized Contracts was adopted to overcome this problem. *Its purpose is to equalize the burden of taxation by requiring the payment of a tax on premiums by persons dealing with unauthorized companies, equivalent to the Gross Premiums Tax payable by registered foreign companies.*" (Italics supplied.)

It was stipulated by the Commonwealth that section 319 of the Act of 1921, P. L. 682, 40 PS §442, authorizes defendant company to enter into contracts of rein-

surance with other insurance companies and that such contracts are beneficial to insurance companies and to the public in general, because "by spreading Pennsylvania risks among unauthorized foreign companies, the public is more assured of the payment of insured losses." Defendant contends that the Commonwealth is attempting to deprive it by reason of the Act of 1917 of its constitutional right to enter into contracts valid in Kansas and England, the jurisdictions in which the contracts of reinsurance in question were made.

Defendant also contends that the Act of 1917 is an unconstitutional extension of the Commonwealth's taxing power beyond the territorial limits of the Commonwealth of Pennsylvania. In support of its contention it cites the decision of the Supreme Court of the United States in Connecticut General Life Insurance Co. v. Johnson, Treasurer of California, 303 U. S. 77 (1938), in which the Supreme Court invalidated a two percent gross premium tax levied by California on the premiums paid by California insurers for reinsurance to the Connecticut General Life Insurance Co. under reinsurance contracts entered into in the State of Connecticut. In holding the tax to be on events over which California had no jurisdiction to tax, the Supreme Court said, page 80:

"But the limits of the state's legislative jurisdiction to tax, prescribed by the Fourteenth Amendment, are to be ascertained by reference to the incidence of the tax upon its objects rather than the ultimate thrust of the economic benefits and burdens of transactions within the state. As a matter of convenience and certainty, and to secure a practically just operation of the constitutional prohibition, we look to the state power to control the objects of the tax as marking the boundaries of the power to lay it. . . . ."

It is the contention of defendant in the instant case that the incidence of the tax imposed by the Act of

1917 is upon an event transpiring beyond the reach of the Commonwealth's taxing power and the fact that Pennsylvania citizens are called upon to deduct the tax from premiums paid or bear this tax themselves, cannot disguise its true nature.

In answer to these contentions, the Commonwealth asserts that there is a clear distinction between the Connecticut General Life case and the case at bar for two reasons: (1) That in the Connecticut case, the State of California was seeking to collect a tax from the reinsuring company itself; and (2) that none of the decisions relied upon by defendant from the landmark decision in Allgeyer v. State of Louisiana, 165 U. S. 578 (1896), to the Connecticut General Life case in 1938 involved a domestic company and that in none of them were any acts essential to the formation of insurance contracts being done within the taxing State and that in each of those cases there was an attempt to tax something which was done outside the taxing jurisdiction of the State and something which was done by a foreign corporation.

The Commonwealth relies upon Osborn v. Ozlin, 310 U. S. 53 (1940), which was decided two years after the Connecticut Life case, and Hoopeston Canning Co. v. Cullen, Superintendent of Insurance of New York, 318 U. S. 313 (1943). In the Osborn case the Supreme Court of the United States upheld a Virginia statute which required foreign insurance companies to do business with resident brokers and which guaranteed such brokers the "usual and customary commissions." Mr. Justice Frankfurter, speaking for the court in that case, commented on the decisions relied on by petitioner as follows, page 66:

"In reaching this conclusion we have been duly mindful of the cases urged upon us by appellants. In Allgeyer v. Louisiana, 165 U. S. 578, apart from the

doubts that have been cast upon the opinion in that case, the state attempted to penalize the making of contracts by its residents outside its borders with companies which had never subjected themselves to local control. Thus the statute was thought to be directed not at the regulation of insurance within the state, but at the making of contracts without. This was followed in St. Louis Compress Co. v. Arkansas, 260 U. S. 346; but see the refined distinctions drawn in Compania de Tabacos v. Collector, 275 U. S. 87. . . . ."

The Hoopeston case, the Commonwealth avers, "would appear to deal the final blow to the prestige of Allgeyer v. Louisiana." In that case reciprocal insurance associations which insured property located in New York, although their attorneys-in-fact were located in Illinois and the contracts of insurance were signed and checks in payment of losses were mailed in Illinois, were held subject to regulation by New York. Mr. Justice Black said in part, page 316:

"In determining the power of a state to apply its own regulatory laws to insurance business activities, the question in earlier cases became involved by conceptualistic discussion of theories of the place of contracting or of performance. More recently it has been recognized that a state may have substantial interests in the business of insurance of its people or property regardless of these isolated factors. This interest may be measured by highly realistic considerations such as the protection of the citizen insured or the protection of the state from the incidents of loss. Alaska Packers Assn. v. Industrial Accident Comm'n, 294 U. S. 532, 542. To insure the protection of state interests it is now recognized that a state may not be required to enforce in its own courts the terms of an insurance policy normally subject to the law of another state where such enforcement will conflict with the public

policy of the state of the forum. Griffin v. McCoach, 313 U. S. 498.

"The actual physical signing of contracts may be only one element in a broad range of business activities. Business may be done in a state although those doing the business are scrupulously careful to see that not a single contract is ever signed within that state's boundaries. Important as the execution of written contracts may be, it is ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction."

Defendant company also alleges that the Act of 1917 has not been uniformly enforced according to its terms in violation of the equal protection clause of the Fourteenth Amendment to the United States Constitution and article IX, sec. 1, of the Constitution of Pennsylvania. It says that despite the broad scope of the language of the Act of 1917 which includes persons, corporations, partnerships and associations, little effort has been made by the Department of Revenue to enforce this act and collect the tax from all persons making contracts of insurance with unregistered and unauthorized foreign corporations. It charges that no effort is made to collect the tax from individuals liable therefore at the time it is due, i.e., when the contract is written. The parties have stipulated in paragraph 14 of the stipulation of facts that the returns were prepared and distributed to the persons, corporations and associations and other entities listed on exhibit A attached to the stipulation of facts. Examination of this list reveals that in the calendar year 1954 the Department of Revenue sent out returns under the Act of 1917 to 48 banks and trust companies, 42 insurance companies and 108 persons, corporations and other associations. It was also stipulated that the gross

revenue from the Act of 1917 in 1954 was $19,618.49 and that of this amount, defendant paid $949.56. Defendant strongly contends that since only 108 returns were sent out by the Department of Revenue to taxpayers in Pennsylvania other than the 90 returns to insurance companies and banks, it must be inferred that the act is not being enforced against other potential taxpayers of the Commonwealth entering into contracts of insurance with foreign unauthorized companies. Commonwealth v. Budd Company, 379 Pa. 159 (1954), is cited in support of defendant's claim of unjust discrimination against it.

Defendant company also contends that by reason of subsequent legislation the Act of 1917 cannot be construed at the present time to impose any tax on contracts of reinsurance with an unauthorized and unregistered foreign insurance company. In considering this contention it should be noted that:

"Every stock or mutual insurance company, association, or exchange *of another State* or foreign government, *authorized to do business in this Commonwealth*, shall make report to the Department of Revenue, on or before March fifteenth of each year . . . . showing the gross premiums of every character and description received from business transacted in the Commonwealth during the year, or fraction of year, ending with the thirty-first day of December preceding, . . . . or whether the same were collected in this Commonwealth or elsewhere, and to pay into the State Treasury the requisite tax upon all such premiums. Such companies, associations, and exchanges, in making such report, *may deduct*, from the gross premiums received, all premiums returned on policies canceled or not taken, and *all premiums* actually received *for reinsurance* . . .": Act of May 17, 1921, P. L. 682, art. III, sec. 321, as last amended by the

Act of July 19, 1951, P. L. 1100, sec. 3, 40 PS §444. (Italics supplied.)

*Domestic* insurance companies incorporated under the law of Pennsylvania, under the Act of June 1, 1889, P. L. 420, sec. 24, as last amended by the Act of December 17, 1951, P. L. 1710, sec. 1, 72 PS §2261, Pocket Part:

". . . *may deduct* from the gross premiums, premium deposits, and assessments, *all amounts* returned on policies cancelled or not taken, and all premiums received *for reinsurance,* . . . Provided, That hereafter the annual tax upon premiums of insurance companies of other states or foreign governments shall be at the rate of two per centum upon the gross premiums of every character and description received from business done within this Commonwealth within the entire calendar year preceding. . . ." (Italics supplied.)

It would appear that since there is *now no tax* imposed on premiums of registered foreign insurance companies *received for reinsurance,* the rate of tax to be imposed on premiums paid to unauthorized insurance companies for reinsurance is *zero.* In discussing this subject, Stradley and Krekstein in Corporate Taxation and Procedure in Pennsylvania (1942), supra, state in vol. 2, §430, page 141, as follows:

"The Unauthorized Contracts Tax is imposed at a rate:

" '. . . equal to the per centum tax imposed on the premiums of insurance companies and associations of other states and of foreign countries that are registered and entitled to do business in this Commonwealth, . . .'

"An important question in the construction of this provision is whether the current two per cent rate of Gross Premiums Tax upon foreign companies is to be applied to *all* premium payments to unauthorized

companies or whether premiums which are exempt from the Gross Premiums Tax should not also be exempt from the Unauthorized Contracts Tax. *The latter construction would appear to be more consistent* with the apparent purpose of the statute to reach premium payments otherwise taxable under the Gross Premiums Tax *and may be supported on the specific ground* that the *applicable* 'per centum' of Gross Premiums Tax, as required in the quoted provision, is *zero* when the premium would not be taxed for Gross Premiums Tax purposes. . . ." (Italics supplied.)

We think the General Assembly when it enacted the Act of 1917 intended to protect the revenue at a time when the Commonwealth taxed reinsurance premiums. The statutes should therefore be construed to avoid imposing tax on the making of *reinsurance* contracts when loss of revenue is no longer involved. The principle of statutory construction that words of a statute should be construed with reference to the purpose of the law is found in section 51, art. IV, of the Statutory Construction Act of May 28, 1937, P. L. 1019, 46 PS §551, which reads in part as follows:

". . . When the words of a law are not explicit, the intention of the Legislature may be ascertained by considering, among other matters — (1) the occasion and necessity for the law; (2) the circumstances under which it was enacted; (3) the mischief to be remedied; (4) the object to be attained; (5) the former law, if any, including other laws upon the same or similar subjects; (6) the consequences of a particular interpretation; (7) the contemporaneous legislative history; and (8) legislative and administrative interpretations of such law."

In view of the foregoing we are of the opinion that since there is *now* no tax imposed on premiums received *for reinsurance* by domestic or foreign insur-

ance companies which are registered and authorized to do business in Pennsylvania, there remains no valid basis upon which the tax imposed by the Act of 1917 can be computed insofar as it relates to the percentum tax imposed on premiums received *for reinsurance* in the instant case.

Section 319(*b*) of the Insurance Company Law of May 17, 1921, P. L. 682, art. III, 40 PS §442, authorizes insurance companies to reinsure portions of their risks with any company authorized to do business in the United States. Section 319(*b*) in its relevant part provides:

"Any domestic or foreign stock or mutual insurance company, association, or exchange, authorized to transact business in this Commonwealth, . . . *shall pay to this Commonwealth taxes required on all business taxable within this Commonwealth and reinsured,* as provided in this section, with any foreign company, association, or exchange not authorized to transact business in this Commonwealth." (Italics supplied.)

Section 319(*b*) thus seems to add a further condition to the imposition of the tax under the Act of 1917 when applied to the meaning of the phrase in the latter act, "equal to the per centum tax imposed on the premiums of insurance companies and associations of other states . . .". An insurance company is required to pay a tax on reinsurance premiums only on ". . . business taxable within this Commonwealth. . . ." Inasmuch as premiums for reinsurance are not taxable under the gross premiums tax, section 319(*b*) would not require the payment of tax when a domestic company reinsures its risks in a domestic or authorized foreign insurance company. It has been held that the Insurance Company Law of 1921, P. L. 682, 40 PS §341 et seq., is a statute imposing taxes and providing for their collection: Chester County Mutual Insurance

Company v. Messner, 63 Dauph. 46, 56 (1952), Neely, J. It would seem reasonable, therefore, to construe section 319(*b*) as not requiring the payment of the tax on unauthorized contracts with respect to reinsurance premiums when such premiums are not taxable under the gross premiums tax.

We believe, moreover, there may be some merit in defendant's contention that the Act of 1917 violates the equal protection clause of the Fourteenth Amendment to the Federal Constitution and the uniformity clause of art. IX, sec. 1, of the Pennsylvania Constitution. Section 1 of the Fourteenth Amendment to the United States Constitution provides in part that no State shall "deny to any person within its jurisdiction the equal protection of the laws".

It has been held by the Supreme Court of Pennsylvania that these two provisions should be construed in pari materia insofar as matters of taxation are concerned. See Commonwealth v. Budd Company, 379 Pa. 159, 167 (1954).

Defendant asserts that the Act of 1917 violates both of these constitutional provisions requiring equality and uniformity of taxation and this discrimination and lack of equality arise from the fact that persons and insurance companies, such as defendant, are unlawfully penalized for their dealings with unauthorized insurance companies. As stated above, domestic and foreign insurance companies authorized to do business in this Commonwealth pay no tax on gross premiums received for reinsurance.

Defendant argues there is no substantial basis to justify the alleged discriminatory tax imposed by the Act of 1917 on persons and companies dealing with *unauthorized* insurance companies, that *reinsurance* of risks "with any stock or mutual insurance company, . . . authorized to transact business in this Commonwealth or authorized to transact business *in*

*any of the United States"* is specifically authorized by section 319(*b*) of the Act of May 17, 1921, P. L. 682, 40 PS §442, and that the legislature of Pennsylvania thereby recognized that there is no difference in reinsuring risks with a domestic or authorized foreign insurance company, as opposed to an unauthorized insurance company. It is therefore urged by defendant company that the Act of 1917, as applied to domestic insurance companies dealing with unauthorized foreign insurance companies, must be declared invalid as discriminating against such companies and it avers in support of this position that the classification between domestic companies reinsuring risks with other domestic insurance companies and authorized foreign insurance companies on the one hand and unauthorized insurance companies on the other hand is arbitrary and unreasonable, since such classification furthers no legitimate object of taxation or public policy of the Commonwealth of Pennsylvania and is not based on any real difference between the insurance companies making contracts of reinsurance.

We have cited the principal contentions of the parties to outline the various aspects of this case. We rest our decision, however, on the ground that under the terms of the Act of 1917 and the subsequent legislation affecting the same, there is no valid basis at the present time upon which the tax claimed by the Commonwealth in the instant case can be sustained. Consequently there is no tax due.

And now, December 30, 1957, it is hereby adjudged and decreed that the Millers Mutual Fire Insurance Company, defendant, is not liable for the payment of the tax claimed in this case and the Department of Revenue and the Department of the Auditor General of Pennsylvania are directed to resettle defendant's account in accordance with this decree.