STATE of South Dakota, Plaintiff
and Appellee,

v.

AMERICAN BANKERS INSURANCE
COMPANY, Defendant and
Appellant.

No. 14690.

Supreme Court of South Dakota.

Argued Feb. 4, 1985.

Decided Sept. 6, 1985.

Mark A. Moreno, Asst. Atty. Gen., Pierre, for plaintiff and appellee; Mark V. Meierhenry, Atty. Gen., Pierre, on brief.

David A. Gerdes of May, Adam, Gerdes & Thompson, Pierre, for defendant and appellant.

WOLLMAN, Justice.

This is an appeal from a final judgment entered by the trial court granting summary judgment in favor of the state ordering American Bankers Insurance Company

(American Bankers) to pay insurance premium taxes. We reverse and remand with directions to dismiss the state's complaint.

The facts here are generally undisputed.

American Bankers, a Texas based corporation, has never been licensed to transact business in South Dakota. It owns and has in force insurance policies on South Dakota residents.

Prior to September 1, 1981, Mid-America Insurance Company, located in Dubuque, Iowa, and authorized to do business in South Dakota, was a wholly owned subsidiary of American Bankers. On September 1, 1981, Mid-America was sold to one Integon Corporation. Incident to this sale, American Bankers assumed ownership of those policies insuring residents of South Dakota.

Since this acquisition, American Bankers has continued to collect premiums from South Dakota policyholders as well as to pay claims made on their respective policies.

Under South Dakota law, each unlicensed or unauthorized insurer doing business in the state is required to pay an insurance premium tax. SDCL 10–44–2(3). On December 2, 1981, December 7, 1982, July 14, 1983, and August 23, 1983, the State Division of Insurance advised American Bankers that pursuant to SDCL 10–44–2(3) it was liable to the state for taxes on those premiums collected on policies in force in South Dakota.

American Bankers denied that it was doing an insurance business in South Dakota and asserted that it was not subject to the premium tax.

Following issuance of a summons and complaint by the state, American Bankers raised the defense of lack of personal and subject matter jurisdiction, as well as challenging the constitutionality of the taxing statute. Both the state and American Bankers moved for summary judgment. The trial court granted the state's motion for summary judgment, finding American Bankers subject to jurisdiction pursuant to South Dakota's long-arm statute. SDCL

15–7–1 and 15–7–2. The court held the premium tax statute to be constitutional, ordering American Bankers to pay all taxes due and owing since 1981.

## I.

### Personal Jurisdiction

American Bankers first contends that it is not subject to the in personam jurisdiction of the South Dakota courts. Specifically, American Bankers argue that its contacts with the State of South Dakota are insufficient to fulfill the due process requirement of "minimum contacts."

In support of its contention, American Bankers cites the following facts: American Bankers has never solicited the sale of any of the policies in dispute, nor has it directly entered into any contract of insurance with any individual in South Dakota; the policies producing the premiums upon which the state seeks to impose the premium tax were acquired by bulk acquisition from Mid-America; this transaction was entered into and contracted for in the State of Texas; American Bankers has no certificate of authority to do business in South Dakota; no servicing of policies has ever been done in South Dakota; American Bankers does not maintain offices in South Dakota, nor does it own any property within the state; American Bankers does not solicit the sale of new policies in South Dakota and has no salesmen or representatives either within the state or working through the mail to sell insurance policies to South Dakota residents; and claims made by South Dakota policyholders are processed in Texas.

SDCL 15–7–2 provides in part:

Any person is subject to the jurisdiction of the courts of this state as to any cause of action arising from the doing personally, through any employee, through an agent or through a subsidiary, of any of the following acts:

(1) The transaction of any business within the state.

. . . .

For purposes of SDCL 15–7–2, a corporation is deemed to be a person. SDCL 15–7–1.

■ SDCL 58–1–2(15), defines "insurance business" as "the transaction of all matters pertaining to a contract, and all matters arising out of that contract or any claim thereunder." Because the collection of premiums and the payment of claims are matters pertaining to and arising out of an insurance contract, SDCL 15–7–2 and 58–1–2(15), when construed together, lend support to the trial court's decision that it had personal jurisdiction over American Bankers.

■ Our inquiry, then, is limited to whether such an application of our long-arm statute violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution. We hold that it does not.

In *Russell v. Balcom Chemicals*, 328 N.W.2d 476, 478–79 (S.D.1983), we recapitulated the standards set forth in a long line of United States Supreme Court decisions regarding jurisdiction over nonresidents:

> In *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), the Court held that states could exercise jurisdiction if the nonresidents had such "minimum contacts" with the state "that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' " 326 U.S. at 316, 66 S.Ct. at 158, 90 L.Ed. at 102 (quoting *Milliken v. Meyer*, 311 U.S. 457, 463, 61 S.Ct. 339, 343, 85 L.Ed. 278, 283 (1940)). Due process requires "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 1240, 2 L.Ed.2d 1283, 1298 (1958). Due process also requires that the defendant's conduct and connection with the forum state be such that he should reasonably anticipate being haled into court there. *Kulko v. California*

*Superior Court*, 436 U.S. 84, 98 S.Ct. 1690, 56 L.Ed.2d 132 (1978); *Shaffer v. Heitner*, 433 U.S. 186, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977).

The principal consideration is whether the nonresident defendant "purposefully established minimum contact in the forum state." *Burger King v. Rudzewiez*, 471 U.S. ——, ——, 105 S.Ct. 2174, 2183, 85 L.Ed.2d 528, 542 (1985) (citing *International Shoe, supra*, at 316, 66 S.Ct. at 158, 90 L.Ed. at 102).

Concerning "interstate contractual obligations," the Court in *Burger King* stated:

> [W]e have emphasized that parties "who reach out beyond one state and create continuing relationships and obligations with citizens of another state" are subject to regulation and sanctions in the other state for the consequences of their activities.

471 U.S. at ——, 105 S.Ct. at 2182, 85 L.Ed.2d at 541 (citing *Travelers Health Association v. Virginia*, 339 U.S. 643, 647, 70 S.Ct. 927, 929, 94 L.Ed.2d 1154, 1161 (1950)). The Court further observed:

> Where the defendant "deliberately" has engaged in significant activities within a state, *or has created "continuing obligations" between himself and residents of the forum, he manifestly has availed himself of the privilege of conducting business there*, and, because his actions are shielded by "the benefits and protections" of the forum's laws, it is presumptively not unreasonable to require him to submit to the burden of litigation in that forum as well.

471 U.S. at ——, 105 S.Ct. at 2184, 85 L.Ed.2d at 543 (emphasis added).

■ The "purposeful availment" requirement is designed to prevent a nonresident defendant from being haled into a jurisdiction "solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts." 471 U.S. at ——, 105 S.Ct. at 2183, 85 L.Ed.2d at 542 (citing *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984)); *Worldwide Volkswagon Corporation v. Woodson*, 444 U.S.

286, 299, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). It is, however, only necessary that the nonresident defendant's contacts with the forum state proximately result from its actions. 471 U.S. at ——, 105 S.Ct. at 2183–84, 85 L.Ed.2d at 542 (citing *McGee v. International Life Ins. Co.*, 355 U.S. 220, 223, 78 S.Ct. 199, 201, 2 L.Ed.2d 223, 226 (1957)).

In the light of the foregoing principles, we are satisfied that American Bankers is amenable to the personal jurisdiction of the South Dakota courts. As a direct result of its acquisition of insurance contracts from Mid-America, American Bankers has entered into a "continuing obligation" with residents of the State of South Dakota. American Bankers has continuously collected premiums and paid claims on these policies since 1981. Consequently, the quality of American Bankers' relationship with South Dakota cannot reasonably be characterized as "random," "fortuitous," or "attenuated." Moreover, out of this relationship with residents of South Dakota, American Bankers realizes a steady source of economic gain.

■ The absence of physical contacts with South Dakota does not compel a contrary conclusion. The Supreme Court has long recognized that the methods of transacting business in "modern commercial life" has "obviated the need for physical presence within a state in which business is conducted." *Burger King v. Rudzewiez*, 471 U.S. at ——, 105 S.Ct. at 2184, 85 L.Ed.2d at 543. "So long as a commercial actor's efforts are 'purposefully' directed toward residents of another state," an absence of physical contacts will not defeat personal jurisdiction there. 471 U.S. at ——, 105 S.Ct. at 2184, 85 L.Ed.2d at 543 (citing *Keeton v. Hustler Magazine, supra*).

American Bankers, nevertheless, argues that even assuming minimum contacts are present, these contacts are unrelated to the subject matter of this action. Thus, the assertion of personal jurisdiction by the state is unreasonable and unfair.

■ Due process requires that the subject matter of the action have some relationship to the contacts upon which jurisdiction is found. *See Rush v. Savchuk*, 444 U.S. 320, 100 S.Ct. 571, 62 L.Ed.2d 516 (1980). The subject matter of this action directly flows from the economic consequences of American Bankers' ongoing commercial activities with residents of South Dakota. Inasmuch as the insurance policies themselves are the object of the tax, we hold that American Bankers could reasonably have foreseen being haled into court in South Dakota to account for its economic activity here.

## II.

### *Subject Matter Jurisdiction*

American Bankers next contends that this court lacks subject matter jurisdiction inasmuch as the legislature has not expressly created a right of action at law to collect unpaid taxes pursuant to SDCL ch. 10–44 (insurance company premium and annuity tax). American Bankers argues that the state's sole remedy for the collection of delinquent taxes is restricted to the use of a distress warrant pursuant to SDCL 10–56–2.

The state contends that Title 15 (Insurance) of the South Dakota Code authorizes an action at law for the collection of taxes. The state cites SDCL 58–6–68, 58–4–5, and 58–4–6 as authorizing this action.

SDCL 58–6–68 provides:

Insurers shall be subject to taxation according to the provisions of Title 10 and shall file such tax returns and reports as may be directed by the director, provided, however, that no tax shall be due or payable as to premiums or considerations received from policies or contracts issued in connection with a pension, annuity or profit-sharing plan exempt or qualified under sections 401, 403(b), 404, 408 or 501(a) of the United States Internal Revenue Code with respect to the tax payable in 1973 and annually thereafter.

SDCL 58–4–5 provides: "The director shall institute such suits or other legal proceedings as may be required for the enforcement of any provisions of this title."

SDCL 58–4–6 provides: "The director shall be represented by the attorney general, his assistants, or by such other attorney at law as may be designated by the attorney general."

The state also cites SDCL 1–11–1, which empowers the attorney general to prosecute all civil actions in which the state is an interested party.

■ We hold the foregoing statutes implicitly authorize an action at law to collect unpaid taxes from an unlicensed and unauthorized insurance company having no property located within the state. There is no indication that the legislature intended SDCL 10–56–2, the distress warrant statute, to be the sole and exclusive remedy available to the state for the collection of unpaid premium taxes.

Our decision in *County of Spink v. Heinold Market, Inc.*, 299 N.W.2d 811 (S.D. 1980), does not foreclose the holding we reach here. *Heinold* held only that the state could not assess personal property taxes on cattle against a party holding only a security interest in cattle. Our holding rested upon the fact that the statutes then in force continually referred to "owner" when referring to the assessment of personal property. *Id.* at 812.

■ To hold that the state could proceed against foreign insurers only by means of distress warrant would enable American Bankers and other similarly situated foreign insurers to circumvent the tax statutes. Accordingly, we hold that the state may maintain an action at law to collect taxes from foreign insurers who have no property within the state.

### III.

*Lack of Statutory Authority to Regulate Foreign Insurers*

American Bankers contends that the complaint fails to state a claim upon which relief can be granted because the state is without express or implied authority to regulate or tax a nonresident foreign insurance company when that company is not doing business within its borders.

■ As we previously observed, American Bankers is doing insurance business within the state within the meaning of SDCL 58–1–2(15). The more particularized inquiry is whether American Bankers' activities are sufficient to warrant the imposition of a tax by the State of South Dakota on premiums collected from South Dakota insureds.

The McCarren-Ferguson Act, enacted by Congress in 1949, empowers the states to regulate and tax all insurance companies "doing insurance business" within their respective borders. 15 U.S.C. §§ 1011–15 (1949). The breadth of the state's authority to regulate and tax interstate insurance transactions under this act was examined by the United States Supreme Court in *State Bd. of Insurance v. Todd Shipyards*, 370 U.S. 451, 82 S.Ct. 1380, 8 L.Ed.2d 620 (1962).

In *Todd*, the Court cites the House report contained in the legislative history of the Act, which states in part:

We should provide for the continued regulation and taxation of insurance by the states, subject always, however, to the limitations set out in the controlling decisions of the United States Supreme Court, as, for instance, in *Allgeyer v. Louisiana* (165 U.S. 578 [17 S.Ct. 427, 41 L.Ed. 832]), *St. Louis Cotton Compress Co. v. Arkansas* (260 U.S. 346 [43 S.Ct. 125, 67 L.Ed. 297]), and *Connecticut General Life Ins. Co. v. Johnson* (303 U.S. 77 [58 S.Ct. 436, 82 L.Ed. 673]), which hold, inter alia, that a state does not have power to tax contracts of insurance or reinsurance entered into outside its jurisdiction by individuals or corporations resident or domiciled therein covering risks within the state or to regulate such transactions in any way.

370 U.S. at 455–56, 82 S.Ct. at 1383, 8 L.Ed.2d at 624.

American Bankers has since 1981 assumed ownership and responsibility for insurance policies taken out by residents of South Dakota for which it has continuously received premiums and paid claims. These are not isolated transactions having no relationship to South Dakota. Rather, American Bankers has established a continuing contractual relationship with residents of this state.

Furthermore, it is not a contradiciton, as American Bankers argues, to be at once an "unauthorized insurer" and at the same time be subject to a tax on premiums collected from South Dakota insureds. South Dakota law permits an unauthorized insurer to engage in a limited degree of insurance business within the state under specified circumstances, including the collection of premiums and payment of claims on existing insurance policies. *See* SDCL 58–6–4.

### IV.

#### *Denial of Equal Protection*

SDCL 10–44–2 provides in part: "Any company doing insurance business in this state shall pay a tax at the rates specified in this section." SDCL 10–44–2(3) imposes a tax upon premiums paid to an insurer not licensed or authorized to do business in the state at a rate of "one and one-half times the amount payable by foreign insurers as provided by this section, or four percent of the premiums whichever is the greater." This is a greater percentage than that paid by either domestic insurers or the foreign companies licensed to do business within South Dakota, which are taxed at a rate of two and one-half percent of the premiums and one and one-fourth percent of the consideration for annuity contracts. SDCL 10–44–2(1), (2).

In *Western & Southern Life Ins. Co. v. State Bd. of Equalization*, 451 U.S. 648, 101 S.Ct. 2070, 68 L.Ed.2d 514 (1981), the United States Supreme Court promulgated a two-part test for analyzing an equal protection challenge to a state tax that imposes a more onerous burden on foreign corporations than on domestic corporations:

In determining whether a challenged classification is rationally related to achievement of a legitimate state purpose, we must answer two questions: (1) Does the challenged legislation have a legitimate purpose? and (2) Was it reasonable for the lawmakers to believe that use of the challenged classification would promote that purpose?

451 U.S. at 668, 101 S.Ct. at 2083, 68 L.Ed.2d at 530–31.

In *Western & Southern*, the Court was asked to decide whether a retaliatory tax imposed by the State of California on a foreign insurer, assessed in response to the insurance tax laws of the foreign insurer's home state, violated the equal protection clause. The Court found that the retaliatory tax had a legitimate purpose not as a revenue raising device, but as a means of pressuring other states to maintain low taxes on California insurers. 451 U.S. at 670, 101 S.Ct. at 2084, 68 L.Ed.2d at 532. The "promotion of domestic industry by deterring barriers to interstate business is a legitimate state purpose." 451 U.S. at 671, 101 S.Ct. at 2084, 68 L.Ed.2d at 532. The Court went on to find the second prong of the test satisfied, holding:

[W]hether in fact the provision will accomplish its objectives is not the question: the Equal Protection Clause is satisfied if we conclude that the California Legislature rationally could have believed that the retaliatory tax would promote its objective.

451 U.S. at 671–72, 101 S.Ct. at 2085, 68 L.Ed.2d at 533.

Here, the state contends that the discriminatory premium tax serves to:

(1) encourage the development and establishment within South Dakota of domestic and foreign insurance companies;

(2) encourage capital investment and capital retention in the state;

(3) promote the development and maintenance of a competitive insurance industry in the state;

(4) raise revenue; and

(5) encourage authorized insurers to transact business in the state.

We examine these stated purposes in the light of *Metropolitan Life Ins. Co. v. Ward*, 470 U.S. ——, 105 S.Ct. 1676, 84 L.Ed.2d 751 (1985), in which the Supreme Court ruled unconstitutional Alabama's domestic preference tax statute.

Under the Alabama statue, foreign life insurance companies paid a tax on their gross premiums received from business conducted in Alabama at a rate of three percent, and foreign companies selling other types of insurance paid at a rate of four percent. All domestic insurance companies, however, paid at a rate of only one percent on all types of insurance premiums, with the result that foreign insurance companies doing the same type and volume of business in Alabama as domestic companies generally would pay three to four times as much in gross premium taxes as their domestic counterparts. Though under the Alabama statute foreign insurance companies could reduce the differential in gross premium taxes paid by investing prescribed percentages of their world-wide assets in specified Alabama assets and securities, they could never reduce their gross premiums tax rate to the same level paid by comparable domestic companies.

The State of Alabama advanced two rationales in justification of the disparate treatment of foreign insurance companies under the statute: (1) encouraging the formation of new companies in Alabama, and (2) encouraging capital investment by foreign insurance companies in Alabama assets and governmental securities.

The Court rejected the first purpose, holding that the promotion of domestic business within a state by discriminating against foreign corporations that wish to compete by doing business there was not a legitimate state purpose. 470 U.S. at ——, 105 S.Ct. at 1682, 84 L.Ed.2d at 760. Similarly, the Court found that the encouragement of capital investment in Alabama assets and governmental securities was not a legitimate state purpose when furthered by discrimination. 470 U.S. at ——, 105 S.Ct.

at 1684, 84 L.Ed.2d at 762. The Court noted that "no matter how much of their assets they invest in Alabama, foreign insurance companies are still required to pay a higher gross premiums tax than domestic companies." *Id.*

The Court distinguished *Western & Southern, supra*, writing:

Alabama has made no attempt, as California did, to influence the policies of other States in order to enhance its domestic companies' ability to operate interstate; rather, it has erected barriers to foreign companies who wish to do interstate business in order to improve its domestic insurers' ability to compete at home.

The crucial distinction between the two cases lies in the fact that Alabama's aim to promote domestic industry is purely and completely discriminatory, designed only to favor domestic industry within the State, no matter what the cost to foreign corporations also seeking to do business there. Alabama's purpose, contrary to California's, constitutes the very sort of parochial discrimination that the Equal Protection Clause was intended to prevent.

470 U.S. at ——, 105 S.Ct. at 1681, 84 L.Ed.2d at 759.

The state contends that *Metropolitan Life, supra*, is not dispositive. First, unlike the Alabama statue, SDCL 10–44–2(3) does not impose a higher tax on all foreign insurers, only on unlicensed and unauthorized foreign insurers. Second, South Dakota's taxation scheme provides a means for foreign insurers to eliminate the higher tax by obtaining a license or certificate of authority from the director of insurance. Therefore, the state contends South Dakota's purpose in imposing a more onerous tax burden on unlicensed, foreign insurers cannot be said to constitute the very sort of "parochial discrimination" the equal protection clause was intended to prevent. We disagree.

▮ The rule is firmly established that the imposition of a discriminatory tax on

foreign corporations on the pretext of promoting domestic industry within the state is prohibited by the equal protection clause. *Metropolitan Life Ins. Co. v. Ward,* 470 U.S. at ——, 105 S.Ct. at 1681–82, 84 L.Ed.2d at 759–60 (citing to *WHYY, Inc. v. Glassboro,* 393 U.S. 117, 119–20, 89 S.Ct. 286, 287, 21 L.Ed.2d 242, 244–45 (1968); *Wheeling Steel Corp. v. Glander,* 337 U.S. 562, 571, 69 S.Ct. 1291, 1296, 93 L.Ed.2d 1544, 1551 (1949); *Hanover Fire Ins. Co. v. Harding,* 272 U.S. 494, 511, 47 S.Ct. 179, 183, 71 L.Ed. 372, 380–81 (1926); 49 A.L.R. 713 (1926); *Southern Rwy. Co. v. Greene,* 216 U.S. 400, 417, 30 S.Ct. 287, 291, 54 L.Ed. 536, 541 (1910)). *See Reserve Life Ins. Co. v. Bowers,* 380 U.S. 258, 85 S.Ct. 951, 13 L.Ed.2d 959 (1965).

■ The state argues that the discrimination practiced by South Dakota is permissible inasmuch as unlicensed foreign insurers can place themselves on an equal footing with domestic insurers by obtaining a certificate to do business in South Dakota. This, the state argues, promotes a more competitive insurance industry in South Dakota by encouraging foreign insurers to do insurance business in South Dakota.

There is, however, a manifest conflict between this stated purpose and SDCL 58–6–4(5), which exempts American Bankers, as a foreign insurer, from obtaining a certificate of authority in South Dakota so long as it only services existing insurance policies. Thus, the very class of foreign insurers which the legislature has exempted from the state's regulatory requirement is the same class of foreign insurers singled out for a higher tax burden because they have not obtained a certificate of authority. The discriminatory premium tax penalizes the very conduct seemingly promoted under SDCL 58–6–4(5). It is apparent, therefore, that the stated purposes for the imposition of a higher tax on unlicensed foreign insurers are pretextual. The higher tax appears to be only a revenue raising device, an impermissible basis for discriminating against a foreign insurer.

We hold, therefore, that inasmuch as SDCL 10–44–2(3) imposes a tax on insurers in American Bankers' situation that is greater than that imposed upon other insurers, that statute is unconstitutional.

The judgment is reversed and the case is remanded to the circuit court with directions to dismiss the state's complaint.

MORGAN and HENDERSON, JJ., and WUEST, Acting Justice, concur.

FOSHEIM, C.J., concurs in part and dissents in part.

FOSHEIM, Chief Justice (concurring in part, dissenting in part).

I agree with the majority that SDCL 10–44–2(3) is constitutionally defective and that the case should be remanded. However, the remand need not totally dismiss the state's complaint.

The majority finds SDCL 10–44–2(3) to be unconstitutional *inasmuch as* the statute imposes a tax on unlicensed and unauthorized foreign companies greater than that tax imposed upon other insurers. Accordingly, the circuit court on remand should be directed to reduce the judgment by the unconstitutional amount. Thus, American Bankers will still be taxes under SDCL 10–44–2(3) but the amount imposed will not exceed that imposed on other companies under SDCL 10–44–2(1) and (2).