MINISTERS LIFE & CASUALTY UNION, Appellant, v. HAASE, COMMISSIONER OF INSURANCE, and another, Respondents.*

*January 4—April 12, 1966.*

* Motion for rehearing denied, with costs, on June 7, 1966.

For the appellant there were briefs by *Ross, Stevens, Pick & Spohn,* attorneys, and *Frank A. Ross, Sr.,* of counsel, all of Madison, and oral argument by *Frank A. Ross, Sr.*

For the respondents the cause was argued by *E. Weston Wood* and *Harold H. Persons,* assistant attorneys

general, with whom on the brief was *Bronson C. La Follette,* attorney general.

Briefs *amici curiae* were filed by *Laikin, Swietlik & Peltin,* attorneys, and *George J. Laikin* of counsel, all of Milwaukee, for the National Association of Life Underwriters and the Wisconsin Association of Life Underwriters.

HALLOWS, J. The challenged sec. 201.42, Stats., entitled "Unauthorized Insurance" was created by ch. 397, Laws of 1961, and purports by its terms to apply to the mail-order insurance business and to be a comprehensive regulating and taxing law [1] of the doing of insurance business in this state by a company which is not licensed

---

[1] Summary of sec. 201.42, Stats. (provisions pertinent to this appeal):

(2) (a) An insurance business is defined as being any of enumerated acts in this state effected by mail or otherwise and the venue of an act committed by mail "is at the point where the matter transmitted by mail is delivered or takes effect." Among the acts listed are: "1. The making of or proposing to make, as an insurer, an insurance contract. . . . 3. The taking or receiving of any application for insurance. 4. The receiving or collection of any premium, commission, membership fees, assessments, dues or other consideration for any insurance or any part thereof. 5. The issuance or delivery of contracts of insurance to residents of this state or to persons authorized to do business in this state. . . .

"(b) . . . 3. Transactions in this state involving a policy lawfully solicited, written, and delivered outside of this state covering only subjects of insurance not resident, located, or expressly to be performed in this state" are exempted as well as other transactions not material to this appeal.

(3) Insurance as defined in the act is prohibited unless authorized.

Service of process on the commissioner is provided by sub. (4) and such service on the secretary of state in sub. (5).

Subs. (6), (7), (8), and (13) impose fines, penalties, and other sanctions against an unauthorized insurer. For instance, in sub. (6) before an unauthorized insurer may file a pleading in a court action or administrative proceeding, he must provide a bond and procure proper authorization to do business in the state.

to do business herein. In the purpose clause, the legislature declared as public policy its concern with "the protection of residents of this state against acts of persons and insurers not authorized to do an insurance business in this state by the maintenance of fair and honest insurance markets, by protecting the premium tax revenues of this state, by protecting authorized persons and insurers, which are subject to strict regulation, from unfair competition by unauthorized persons and insurers and by protecting against the evasion of the insurance regulatory laws of this state." The legislature expressly stated that in enacting the law it exercised its power to protect the residents of the state and to define what constitutes doing an insurance business in this state and also exercised the power and privilege available to it by virtue of Public Law 79–15 (1945) (Ch. 20, 1st Sess., S., 340), 59 Stat. 33, the McCarran Act.

(8) Contracts of insurance made by unauthorized insurers are unenforceable by such insurer. Any person who assisted in the procurement of unauthorized insurance is liable to the insured as a guarantor of the contract.

(9) This subsection is directed at persons who are insured by an unauthorized insurer by requiring them to produce their contracts and disclose information about such transactions with sanctions for failure to do so.

(10) The reporting of unauthorized insurance by persons investigating or adjusting any loss of any such unauthorized insurance is required.

(11) A three percent tax is levied on premiums of unauthorized insurance done in this state by unauthorized insurers. This tax is one percent more than the two percent tax levied upon licensed insurers.

(12) A secondary liability is imposed upon the insured who is also subject to primary liability for the payment of a premium tax in the case of independently procured insurance, with some exceptions.

(13) An unauthorized insurer is subject to a fine of not more than $5,000 and in addition to a forfeiture in the sum of $500 for the first offense and for each additional month during which the insurer continues to violate the statute.

Ministers was organized under the laws of Minnesota sixty-four years ago and is representative of that class of insurance companies which had their origin in the early Traveling Men's Associations which served a selective class of members principally on a direct-mail basis. It is now a mutual legal-reserve life company selling accident and health and life insurance policies to ministers and professional religious workers in the United States and Canada principally by direct mail even in those states in which it is licensed. It is licensed to do business in 10 states and in all but two provinces of Canada. It has agents in seven states and one province of Canada.

Wisconsin is a state in which Ministers is not licensed to do business, has no agents therein, and operates on a direct-mail basis. It issues four kinds of insurance policies, group life, individual life, franchised-group accident and health, and individual accident and health. It solicits business through advertisements in national publications and in church and other religious publications. Direct-mail solicitation and group leaders are also used extensively. General mailing is sent to between 60,000 and 140,000 eligible persons some six times a year and a special mailing to between 6,000 and 8,000 selected individuals approximately 12 times a year. In Wisconsin approximately 25,000 mail solicitations are made annually to approximately 3,600 residents. In the case of individual policies, upon receiving an inquiry at its home office in Minneapolis, Ministers mails an application to the prospect who fills it out and mails it back to Ministers. This application is usually accompanied by the first premium. The policy is prepared, signed, and mailed to the applicant from its home office. Under its articles of incorporation, a person becomes a member of Ministers upon delivery and acceptance of the policy and the applicant is given an opportunity to examine the policy upon its receipt; if unsatisfactory, he may reject it and mail it back and his premium will be refunded. All the

mailing of notices of premium and other mailing is done at the home office of Ministers and all premiums are payable and received there.

If, in this process of mail-order selling, Ministers needs additional information for underwriting purposes, it obtains it through correspondence with the applicants or from local doctors or by employing national investigatory agencies. For medical information Ministers may use the family physician by mailing a medical-report form to him requesting that he fill it out and return it to the home office. The doctor is paid by Ministers for such services. Physical examinations when required are made by the family physician and occasionally by some other doctor selected by Ministers. All contacts between Ministers and the doctor are by mail and the cost of the medical examination is paid by Ministers. If other local investigation is required, Ministers uses national investigatory agencies either on a basic-charge basis or upon agreed-hourly charge or some other specially-arranged charge. Claims for accidental death, for disability under accident and health policies and for death which occurs during the contestable period of a life policy are generally investigated. While these national agencies have no power to negotiate or settle claims, they do make the necessary investigation and report to Ministers.

Ministers pays claims from its home office on proof-of-claim forms furnished to the claimant or which are generally attached to the policy when issued. Further claim forms, if needed, are sent to the claimant who furnishes such other data and certification and reports as may be necessary.

In selling group-life and group-franchise accident and health insurance a slightly different procedure is followed. A group leader is selected by the group and he negotiates with Ministers by mail for the group policy. In the case of group life, Ministers sends to the group leader its literature and appropriate forms. The group

leader undertakes to enroll the individual members of the group on enrollment cards which are sent to Ministers. A master policy for a group is issued and individual members receive a certificate of insurance. A premium notice for the group is sent to the group leader who collects and remits the premiums. However, in the case of a group-franchise accident and health policy each member of the group makes his own application and receives an individual policy direct from Ministers and premium notices after the first premium are mailed directly to the individual member. The activities of the group leader in this latter form of selling are to initiate the original application and the initial premium and to get the group started. No group leader is compensated by fee nor are expenses reimbursed by Ministers, nor does he handle any claims on the group policy.

Ministers has no office, officer, bank account or real estate in Wisconsin. It does own some mortgages secured by Wisconsin real estate. Approximately one third of the policies held by residents of Wisconsin were issued while such persons were residents of other states.

The business done by Ministers is not insignificant; although compared with large stock companies, it would hardly be considered impressive. As of August 1, 1962, Ministers had in force in the state 626 individual-life policies with approximately $2,000,000 insurance in force, 1,842 individual accident and health policies, two group-life policies covering about 85 individuals, and six franchise-group accident and health policies covering about 350 individuals. In the period from 1955 when Ministers wrote premiums totaling $83,516, it has grown so that in 1961 it wrote premiums of $208,240.

This case does not involve sporadic sales of insurance but a continuous and systematic course of business conduct and the question is whether this conduct or activity is of such a quality and nature and so related to the purpose of the regulation and bears such relationship to

Wisconsin in respect to the state's interest in such activity and the subject of the insurance that this state may regulate and tax it. Phrased in traditional conceptual language of "presence in the state," is Ministers "doing business" in the state of Wisconsin for the purpose of regulating that business?

Ministers contends the state of Wisconsin has no jurisdiction to tax or regulate its mail-order insurance business by sec. 201.42, Stats., because that section violates (1) the commerce and the supremacy clauses, (2) the due-process clause, (3) the contract clause, and (4) the postal clause of the United States constitution.

We do not agree and expressly hold the state of Wisconsin has jurisdiction to enact an insurance regulatory and taxing statute such as sec. 201.42, Stats. The insurance business from its very inception has been so permeated with public interest and with the need for regulation that it has been considered the proper object of regulation by the state. As early as 1869 the supreme court held in *Paul v. Virginia,* 75 U. S. (8 Wall.) 168, 19 L. Ed. 357, that the fire-insurance business although properly subject to local regulation was not interstate commerce and thus subject to federal regulation. In reliance upon that case and many subsequent cases which enlarged the doctrine to include other phases of insurance,[2] the states enacted a variegated mass or network of insurance regulations. However, in 1944 in *United States v. South-Eastern Underwriters Asso.* [SEUA], 322 U. S.

[2] *National Union Fire Ins. Co. v. Wanberg* (1922), 260 U. S. 71, 43 Sup. Ct. 32, 67 L. Ed. 136 (hail insurance); *Northwestern Mutual Life Ins. Co. v. Wisconsin* (1918), 247 U. S. 132, 38 Sup. Ct. 444, 62 L. Ed. 1025 (life insurance); *New York Life Ins. Co. v. Deer Lodge County* (1913), 231 U. S. 495, 34 Sup. Ct. 167, 58 L. Ed. 332 (life insurance); *Nutting v. Massachusetts* (1902), 183 U. S. 553, 22 Sup. Ct. 238, 46 L. Ed. 324 (marine insurance); *Hooper v. California* (1895), 155 U. S. 648, 15 Sup. Ct. 207, 39 L. Ed. 297 (marine insurance); *Bothwell v. Buckbee, Mears Co.* (1927), 275 U. S. 274, 48 Sup. Ct. 124, 72 L. Ed. 277 (strike insurance).

533, 64 Sup. Ct. 1162, 88 L. Ed. 1440, the supreme court held the modern business of insurance was interstate commerce and thus subject to regulation by Congress under the commerce clause. That decision seriously affected state regulation and upon the urging of the insurance industry, Congress responded the following year with the passage of the McCarran Act, 59 Stat. 33, ch. 20, 15 USC, secs. 1011–1015 (1964 ed.). This act left to the states the regulation and taxation of insurance, stating such continual regulation was in the public interest and that silence on the part of Congress should not be construed to impose any barrier to state regulation or taxation.[3]

By virtue of the McCarran Act as construed in *State Board of Ins. v. Todd Shipyards Corp.* (1962), 370 U. S. 451, 82 Sup. Ct. 1380, 8 L. Ed. (2d) 620, Ministers claims the states were granted only a limited power to regulate and tax insurance companies or at least the constitutional standard of due process as applied to a state's jurisdiction to regulate insurance as established in the pre-SEUA decisions of the supreme court was frozen, thus substituting for a flexible and developing constitutional standard of due process a more fixed and rigid statutory standard. Thus it is claimed, because sec. 201.42, Stats., in effect prohibits the doing of a mail-order insurance business with Wisconsin residents, that it exceeds this limited grant of power, not because it violates the due-process clause but because it violates the commerce and supremacy clauses.

The lower court rejected this reasoning and held the commerce clause was not involved, at least not in the tra-

---

[3] The act also provided the business of insurance and every person engaged therein was subject to the laws of the several states which related to regulation or taxation of such business and no act of Congress was to be construed as invalidating any state law for such purpose unless such acts specifically related to the business of insurance. Provision was then made for the application of the Sherman Act, Clayton Act and Federal Trade Commission Act.

ditional sense that it was violated. Whether the power of a state to regulate and tax the doing of an insurance business is phrased in the language of a limited power granted under the commerce clause by the enactment of the McCarran Act or whether we view the state's power as being limited by a dated application of the due-process clause makes no practical difference in the result of this case. Such a dispute between the parties seems to be "a rose by any other name."

However, it would seem the McCarran Act did not, in common parlance, grant the states any power but left them with the indigenous power they then possessed unaffected by reason of the commerce clause excepting to the extent provided in the act and the disclaimer of the "unilluminated silence" rule. It has been said the act merely rendered unto Caesar the things which belong to Caesar. *North Little Rock Transportation Co., Inc., v. Casualty Reciprocal Royal Exchange* (1949), 85 Fed. Supp. 961, 964.

The validity of the McCarran Act was sustained in *Prudential Ins. Co. v. Benjamin* (1946), 328 U. S. 408, 66 Sup. Ct. 1142, 90 L. Ed. 1342, which dealt with the validity of a South Carolina statute imposing on foreign insurance companies as a condition of their doing business within that state an annual three percent tax on premiums from business done within the state without reference to the character of the transactions as interstate or local. The statute was held valid and the court observed that Congress in passing the McCarran Act had "put the full weight of its power behind existing and future state legislation to sustain it from any attack under the commerce clause . . . ."

The precise nature and extent of a state's power to regulate insurance was again examined in *State Board of Ins. v. Todd Shipyards Corp., supra,* which is relied upon by Ministers for its theory that the state's jurisdiction to regulate was in effect put in a deep freeze and con-

fined to cases decided prior to SEUA. We think the outer limits of the vital and ever-growing standards of due process were defined in *Todd* to be the holdings in a trilogy of cases, but we do not read *Todd* as freezing state regulation to the type then extant and as forever barring within these outer limits the expansion of the regulation of the insurance industry by states to meet the ever-growing social needs and problems of modern civilization. The so-called contact concept of due process in relation to the state's jurisdiction to tax and regulate the "doing of insurance business" within its borders may be applicable to new facts within the outer limits decided factually by *Allgeyer v. Louisiana* (1897), 165 U. S. 578, 17 Sup. Ct. 427, 41 L. Ed. 832; *St. Louis Cotton Compress Co. v. Arkansas* (1922), 260 U. S. 346, 43 Sup. Ct. 125, 67 L. Ed. 297; and *Connecticut General Life Ins. Co. v. Johnson* (1938), 303 U. S. 77, 58 Sup. Ct. 436, 82 L. Ed. 673.

In *Allgeyer,* the court held unconstitutional under the due-process clause a Louisiana statute which imposed a fine upon anyone who effected insurance on property in Louisiana with an insurance company not licensed in Louisiana. The defendant contracted in New York with an insurer not licensed in Louisiana for a marine policy covering shipments of cotton to be made from Louisiana. The only thing done in Louisiana was the mailing of a letter in reference to the shipment. No solicitation was made, no claims investigated or settled or any other activity by the insurer within the state by mail or otherwise. In its approach to the problem, the court considered the location of the making of the insurance contract as the significant event in the insurance business. In the *Cotton Compress Case,* the cotton compress company, a Missouri corporation but licensed in Arkansas, obtained a fire policy in Missouri covering its property in Arkansas from an insurer not licensed in Arkansas. The statute of Arkansas imposes a five percent premium tax paid on

insurers not licensed to do business in the state, while the rate for authorized companies was two percent. On the basis that no act was done within the state and a state may not regulate activities beyond its borders, the statute was held unconstitutional. On the same grounds, *Connecticut General* held unconstitutional a California statute taxing premiums paid by an insurer licensed in that state to a foreign corporation also licensed in that state on reinsurance of policies insuring lives of California residents. Reinsurance contracts were made and premiums and losses paid in Connecticut.

These three cases have the common element that the insurer involved carried on no activities within the taxing or regulating state either by mail, by agents, by independent contractors, or otherwise, in connection with the insurance transaction involved. All the activities to produce the policy and to service it took place wholly outside the state seeking to impose the tax. Significantly, the only contact was the location of the risk within the state which standing alone was not sufficient for jurisdiction.

In *Todd*, the court had before it a Texas statute requiring the payment of five percent gross-premium tax upon any person who purchased from an insurer not licensed in Texas a policy covering risks within the state unless the policy was purchased through an agent licensed in Texas. Todd, the insured, was a New York corporation which operated shipyards in various states including Texas and was licensed to do business in Texas. It negotiated an insurance policy in New York with brokers for two English insurers, insuring primarily its property in Texas against loss and its liability for damage to property of others. The policy was issued in New York and accepted there by Todd. All premiums and losses were paid in New York. The insurers were not licensed in Texas, had no place of business or any agent there and did not investigate the risks or claims there.

It made no solicitation of any kind in Texas. Adjustments of losses were carried on in New York. The only connection between Texas and the insurance transaction was the fact the property covered by the insurance was located in Texas.

Because the facts in *Todd* were so similar to the facts in the *Allgeyer, Cotton Compress* and *Connecticut General Cases,* the supreme court was asked to re-examine the validity of the trilogy and to adopt the approach of *Osborn v. Ozlin* (1940), 310 U. S. 53, 60 Sup. Ct. 758, 84 L. Ed. 1074, and *Hoopeston Canning Co. v. Cullen* (1943), 318 U. S. 313, 63 Sup. Ct. 602, 87 L. Ed. 777. The philosophy of these two cases within the framework of the due-process limitation considers as a whole all aspects of the insurance transaction having contacts with the state and the relationship of the regulation involved to the state's interest in those aspects. In this posture the supreme court refused to re-examine the validity of the three older cases, stating the policy announced by Congress in the McCarran Act was one which the industry had reason upon which to rely since the *Allgeyer* decision in 1897. Then in picturesque language, the court stated, "Congress tailored the new regulations for the insurance business with specific reference to our prior decisions. Since these earlier decisions are part of the arch on which the new structure rests, we refrain from disturbing them lest we change the design that Congress fashioned."

If we read *Todd* correctly, it held *Allgeyer, St. Louis Cotton Compress* and *Connecticut General* were not to be re-examined and overruled but constitute the outer limits within which the doctrine of due process must be confined. *Todd* does not hold any static or conceptualistic theory of "doing business" as the jurisdictional basis for state regulation, nor did it overrule the *Osborn* and *Hoopeston* decisions or approach. It might well have reached the

same result on the facts, applying the *Osborn-Hoopeston* philosophy.[4]

These two cases are also a part of the pre-SEUA cases and more so in respect to regulation than *Minnesota Commercial Men's Asso. v. Benn* (1923), 261 U. S. 140, 43 Sup. Ct. 293, 67 L. Ed. 573, which is relied upon by Ministers.

*Benn,* which was not mentioned in *Todd,* involved an unlicensed foreign corporation doing an insurance business by mail within the state of Montana whose law subjected such insurers to service of process. The court held the law unconstitutional and Ministers argues the case is controlling here because if a state in 1923 had no jurisdiction over a mail-order insurance company for service of process *a fortiori,* a state would have no jurisdiction for taxation or regulation, since the contacts between the state and the object regulated must be more substantial to regulate or tax than in service-of-process cases to satisfy due process. We do not think the McCarran Act even as interpreted by *Todd* solidified the state's jurisdiction to regulate or tax insurance business by such an analogy to *Benn.* This view has been taken by the trial court of the county of Los Angeles, California, *People of the State of California v. National Liberty Life Ins. Co.,* Case No. 865,425, superior court, Los Angeles county, December 23, 1965. That decision is not persuasive or controlling upon us. Nor do we agree that because no case presented itself prior to the McCarran Act for the application of the *Osborn-Hoopeston* approach to the regulation or tax of a mail-order insurance business, such as is presented here, that by inference or otherwise *Todd* decided such approach was not applicable to mail-order insurance business.

[4] This view was taken in the *amicus curiae* brief of Cloyd La Porte filed in *Todd* on behalf of the Church Fire Ins. Corp. and the Catholic Relief Ins. Co. of America and referred to in the *Todd* decision. This brief was made a part of the record in this case.

*Benn's* "presence concept" of doing business may be conceded to no longer have vitality in the field of jurisdiction for service of process in view of *International Shoe Co. v. Washington* (1945), 326 U. S. 310, 66 Sup. Ct. 154, 98 L. Ed. 95, whose minimum-contact theory of jurisdiction was proclaimed only a few years after the decision in *Osborn* and *Hoopeston* in the related field of states' jurisdiction to tax and regulate. In fact, *Travelers Health Asso. v. Virginia* (1950), 339 U. S. 643, 648, 70 Sup. Ct. 927, 94 L. Ed. 1154, in reference to an argument that *Benn* was controlling, said, quoting *Hoopeston,* "we rejected the contention, based on the *Benn* case among others, that a state's power to regulate must be determined by a 'conceptualistic discussion of theories of the place of contracting or of performance.' Instead we accorded 'great weight' to the 'consequences' of the contractual obligations in the state where the insured resided and the 'degree of interest' that state had in seeing that those obligations were faithfully carried out." In a concurring opinion Mr. Justice DOUGLAS, who authored *Todd,* pointed out it was the nature of the state action which determined the kind and degree of activity in the state necessary to satisfy the requirements of due process.

We think *Osborn* and *Hoopeston* are sufficient authority for Wisconsin's jurisdiction to regulate the type of insurance business presented by the instant facts and represent the prevailing view of the jurisdiction to tax and regulate an insurance business within the limits of due process. In *Osborn* the court justified a Virginia statute which prohibited insurers licensed in Virginia from making contracts of insurance on persons or property in the state except through licensed resident agents who were to countersign such policies and receive at least one half of the customary commission. As here, the claim was made the state's statute sought to intrude upon business transactions beyond its borders. The court

denied such contention, stating Virginia's "interest in the risks which these contracts are designed to prevent warrants the kind of control she has here imposed." The court thought Virginia had a definable interest in that which she sought to regulate and distinguished the *Allgeyer* and *Cotton Compress Cases*. The *Osborn* decision was not predicated upon the fact the insurance companies to which the law applied were licensed to do business in Virginia or upon the place of contracting but principally upon the power of the state to regulate a business affecting a matter of great public interest and concern to the state. Ministers' distinction of this case, based upon *Compania de Tabacos v. Collector* (1927), 275 U. S. 87, 48 Sup. Ct. 100, 72 L. Ed. 177, and *Equitable Life Assurance Society v. Pennsylvania* (1915), 238 U. S. 143, 35 Sup. Ct. 829, 59 L. Ed. 1239, and other cases, is in our view without merit. It is true, public interest alone is not sufficient to give a state jurisdiction, but great concern and public interest do add significance to contacts which compose the organic whole and are directly related to the regulation and which might not otherwise be sufficient to meet the standard of the due-process clause.

*Hoopeston* was decided a few years after *Osborn*. This case involved reciprocal-insurance associations whose attorney-in-fact was located in Illinois. The suit was brought by a reciprocal-insurance association to have declared unconstitutional a New York statute which prohibited reciprocal-insurance associations from doing business in New York unless licensed therein. In this case, a canner in New York signed an application, sent it to the attorney-in-fact in Chicago. If the canner was accepted for membership he would sign a power-of-attorney and forward it to the attorney-in-fact. Sometimes an insurance engineer investigated the risk and in some instances he might service the policy. Under the standard fire policy, the option to rebuild and repair the damaged

property was reserved. Losses were paid by check from Illinois. In sustaining the statute, the court took the view that in determining the power of a state to regulate the doing of insurance business in the state the earlier conceptualistic theories of the place of contracting or of performance to determine the "presence" of the business which Ministers relies upon here, were no longer of importance. *Hoopeston* recognized a state may have substantial interests in the business of insuring its people and property which may be measured by the need for the protection of its citizens by the regulation of the industry.

Significantly, the court viewed the actual physical signing of the contracts as only one element in the broad range of the business activities, and while important, it was "an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction." The court realistically stated that in the insurance business, a transaction neither begins nor ends with the execution of the contract. Under *Hoopeston's* philosophy and approach "in determining whether insurance business is done within a state for the purpose of deciding whether a state has power to regulate the business, considerations of the location of the activity prior to and subsequent to the making of the contract, *Osborn v. Ozlin, supra,* of the degree of interest of the regulating state in the object insured, and of the location of the property insured are separately and collectively of great weight."

While the facts in the instant case may not be as strong as the facts in *Hoopeston,* the contacts with Wisconsin are measurably more than found in the *Todd* type of case. Here, we have a systematic solicitation of insurance by mail, not sporadic but continuous, and in addition, group leader's solicitations. We need not consider group leaders as agents but even Ministers should admit they are significant contacts which were encouraged to

work for Ministers' benefit and which were relied upon as a method of doing business. Besides, Ministers utilizes the necessary services of investigatory agencies and doctors in the state for underwriting and claim-settlement purposes, carefully avoiding designating them agents but securing the same results. Ministers has "realistically entered the state looking for and obtaining business." It is not essential that the issuance of the policy be done in Wisconsin to "exploit the consumer market." For pre-SEUA cases on what constitutes doing business within the state by foreign insurance corporations, see Anno. 137 A. L. R. 1128. The activities essential to the conduct of this insurance business, both prior to and subsequent to the making of the contract and which are part of the organic whole, take place in Wisconsin and, in addition, the subjects of the insurance are in this state. In common parlance and in any enlightened sense, it cannot be said that Ministers does not do business in Wisconsin.

This court has adopted the modern contact concept of jurisdiction in service-of-process cases. *Prime Mfg. Co. v. Kelly* (1958), 3 Wis. (2d) 156, 87 N. W. (2d) 788; *Bond v. Harrel* (1961), 13 Wis. (2d) 369, 108 N. W. (2d) 552, 98 A. L. R. (2d) 330. See also *Pavalon v. Fishman,* ante, p. 228, 140 N. W. (2d) 263; *Travelers Ins. Co. v. McArthur & Sons* (1964), 25 Wis. (2d) 197, 130 N. W. (2d) 852. We have also adopted the contact theory of doing business to jurisdiction to tax. *Moore Motor Freight Lines v. Department of Taxation* (1961), 14 Wis. (2d) 377, 111 N. W. (2d) 148. Recently we adopted this approach in the area of conflict of laws. *Wilcox v. Wilcox* (1965), 26 Wis. (2d) 617, 133 N. W. (2d) 408.

Ministers relies on *American Oil Co. v. Neill* (1965), 380 U. S. 451, 85 Sup. Ct. 1130, 14 L. Ed. (2d) 1, and cases of that type for the proposition that aside from its theory the McCarran Act froze the due-process concept, the due-process clause forbids the enactment of sec.

201.42, Stats. The application of the contact concept of jurisdiction to regulate or tax cannot be measured by a mathematical or quantitative rule. Other cases are helpful but generally not controlling or are dispositive, and in such class falls the cases cited by Ministers. Likewise, we refrain from citing cases sustaining regulation or taxing statutes of other types of businesses. For a review and analysis of the problem, see 2 Couch, Insurance (2d ed.), ch. 21, p. 431, Regulation and taxation of insurers; Anno. Insurance-State Taxation or Regulation, 164 A. L. R. 500.

The impact of this section on Ministers is not so serious as to violate the due-process standard. The inconvenience and the change in its mode of business are arguments properly made to the legislature but in this case hardly render the section unconstitutional. While it is conceded the premium tax is modest and not burdensome, it is claimed the regulatory parts prohibit assessment policies, require the issuance of policies by resident licensed agents, require financial reports different from other states, and regulate the form of policies. Obviously, any necessary regulation substantial enough to protect the citizens of a state will cause inconvenience and adjustments in the insurance business. Uniform policies, uniform forms of financial reports and issuance of policies by licensed agents are not unreasonable. Financial requirements to insure the solvency of the insurer are common and necessary in insurance regulation. True, Wisconsin regulation may have some repercussions beyond its borders and may run counter to Ministers' economic theories of doing business but these are of no judicial significance. We cannot find merit in its argument that although Wisconsin's regulations alone may not be a prohibitive burden, such regulations will be burdensome if the pattern of its legislation is adopted by other states.

We need not dwell on the degree of interest and concern Wisconsin has in the regulation of insurance and particularly the regulation under inquiry. Its grasp has not exceeded its reach of legitimate interest in the regulation of mail-order insurance insuring the life and health of its residents in the manner in which Ministers conducts its business. No claim is made the methods adopted are not germane to the objects of the legislation; the claim is only, "You can't do this to me." We do not hold, however, that any one single act defined as doing business in the state in sec. 201.42, Stats., is alone sufficient for the application of the section to a given business. Each set of facts must be considered on its own merits when applying the statute.

It is contended by Ministers, sec. 201.42, Stats., violates the contract clause, sec. 10, art. I, United States constitution, and sec. 12, art. I, Wisconsin constitution, because by sub. (8) it prevents Ministers from carrying out its obligation to renew those of its policies which contain guaranteed renewal clauses. Sub. (8) provides any contract of insurance entered into by an unauthorized insurer is unenforceable by the insurer. Ministers claims approximately one third of its policies were written outside of the state when the members were nonresidents of Wisconsin. As to such contracts, sub. (2) (b) 3 exempts such policies from the unenforceability prescribed by sub. (8). In respect to contracts made with Wisconsin residents, the trial court held the policies were void and thus this section would not impair any of their obligations. It relied on *Presbyterian Ministers' Fund v. Thomas* (1905), 126 Wis. 281, 105 N. W. 801, but that case held an insurance contract made in Pennsylvania with a Wisconsin resident under the then statute to be unenforceable, not void. Presumably some of Ministers' policies insuring Wisconsin residents were written on a guaranteed renewal basis. However, the facts do not disclose any particular policies or the particular facts of their issuance.

In the stipulation of facts, it is stated that while some of the accident and health policies and all of the accident policies confer upon Ministers the right to refuse to renew, it is certified to its members that for many years it has followed a policy not to cancel or refuse to renew accident and sickness insurance because the member has become a poor insurance risk. The president of Ministers testified that if sec. 201.42, Stats., were valid and if Ministers could not obtain a license, it would have to terminate a large number of policies which it felt it was under a moral obligation to continue. This falls short of an obligation of contract. If Ministers is unable to qualify or refuses to qualify, we do not see how that non-action could constitute an impairment of contract by sec. 201.42. At most, this section perpetuates former statutes making insurance issued by unlicensed insurers unenforceable in this state by those insurers. Such contracts as Ministers may have with guaranteed-renewal options by the insured were made in light of such statutes and therefore it cannot be claimed that sub. (8) of the statute is a law which impairs the obligation of the contracts.

As a criminal statute, sec. 201.42, Stats., is also challenged under the due-process clause because it fails to meet standards of specificity and clarity and it punishes acts committed beyond the state border. Not every indefiniteness or vagueness is fatal to a criminal statute or a statute such as sec. 201.42 prescribing criminal sanctions. A fair degree of definiteness is all that is required. It is sufficient if the standard of guilt is reasonably ascertainable by men of common intelligence without guessing at its meaning. *Winters v. New York* (1948), 333 U. S. 507, 68 Sup. Ct. 665, 92 L. Ed. 840; *State v. Evjue* (1948), 253 Wis. 146, 33 N. W. (2d) 305. At the most, Ministers suggests marginal cases of interpretation and these are not sufficient to render the statute vague. *United States v. Harriss* (1954), 347 U. S. 612, 74 Sup. Ct. 808, 98 L. Ed. 989. It is clear from the language of

the section that it applies to Ministers' method of operation; no reasonable person could doubt such application.

Relying on *Hotzel v. Simmons* (1951), 258 Wis. 234, 45 N. W. (2d) 683, for the proposition that Wisconsin has no constitutional power to punish an act not done within its borders, Ministers argues the section is invalid for that reason. This argument is based on the concept that Ministers is doing business outside but not in the state of Wisconsin and must fail for the reasons hereinbefore discussed. Furthermore, any inability of Wisconsin to enforce its criminal laws directly on persons who are outside the state does not affect the validity of the law and is no argument for its invalidity.

Ministers' final attack on the statute as a violation of the postal clause, sec. 8, art. I, United States constitution, is without merit. The Wisconsin section does not interfere with the use of the mail, does not prohibit Ministers from using the mail and more importantly does not interfere with Congress' exclusive power to determine what shall be carried and what shall be excluded in the mails. The postal clause is not talismanic and does not immunize Ministers from regulation.

*By the Court.*—The judgment declaring sec. 201.42, Stats., constitutional and applicable to the plaintiff in its insurance business with residents of Wisconsin and requiring the plaintiff to comply with its provisions is affirmed.

GORDON, J. (*dissenting*). I must respectfully dissent. In *State Board of Ins. v. Todd Shipyards Corp.* (1962), 370 U. S. 451, 82 Sup. Ct. 1380, 8 L. Ed. (2d) 620, it was held that the McCarran Act restored to the states those regulatory powers over the insurance business which the states possessed prior to *United States v. South-Eastern Underwriters Asso.* (1944), 322 U. S. 533, 64 Sup. Ct. 1162, 88 L. Ed. 1440. In other words, the McCarran Act was construed as having made only a limited grant of

power to the states. The extent of that limitation is to be found in the *Todd Case*. At page 455 of the decision in the *Todd Case*, the court stated:

"For we have in the history of the McCarran-Ferguson Act an explicit, unequivocal statement that the Act was so designed as not to displace those three decisions. The House Report stated:

" 'It is not the intention of Congress in the enactment of this legislation to clothe the States with any power to regulate or tax the business of insurance beyond that which they had been held to possess prior to the decision of the United States Supreme Court in the *Southeastern Underwriters Association case*. Briefly, your committee is of the opinion that we should provide for the continued regulation and taxation of insurance by the States, subject always, however, to the limitations set out in the controlling decisions of the United States Supreme Court, as, for instance, in *Allgeyer v. Louisiana* (165 U. S. 578), *St. Louis Cotton Compress Co. v. Arkansas* (260 U. S. 346), and *Connecticut General Life Ins. Co. v. Johnson* (303 U. S. 77), which hold, inter alia, that a State does not have power to tax contracts of insurance or reinsurance entered into outside its jurisdiction by individuals or corporations resident or domiciled therein covering risks within the State or to regulate such transactions in any way.' HR Rep. No. 143, 79th Cong., 1st Sess., p. 3.

"Senator McCarran, after reading the foregoing part of the House Report during the Senate debate, stated, '. . . we give to the States no more powers than those they previously had, and we take none from them.' 91 Cong. Rec. 1442."

It will be noted from the foregoing that the House Report described the three cases of *Allgeyer, St. Louis Cotton* and *Connecticut General Life* only as *examples* of the limitations which would apply; it is quite clear that the limitation upon state powers was not to be confined to those three decisions.

In addition to the limitation of the three recited cases, there is applicable, as a result of the *Todd Case,* the constitutional restriction implicit in *Minnesota Commer-*

*cial Men's Asso. v. Benn* (1923), 261 U. S. 140, 43 Sup. Ct. 293, 67 L. Ed. 573. The *Benn Case* related to the service of process rather than to state regulation. The effect of the *Benn Case* on the question of the service of process has been changed by subsequent decisions; nevertheless, at the time of the *Todd Case* the concept of the *Benn Case* was incorporated into the interpretation of the McCarran Act, and this has not been changed.

Accordingly, it is my opinion that the regulatory powers of the state of Wisconsin cannot apply to the type of operation that is engaged in by Ministers Life & Casualty Union; the latter's method of doing business is strikingly similar to that which was employed by the Minnesota Commercial Men's Association in the *Benn Case*.

Wisconsin's interest in regulating the insurance sold to its citizenry does not enable the courts of Wisconsin to surmount the commerce clause or the supremacy clause. Unless the McCarran Act can be found to have returned regulatory power to the states in this type of case, the insurance business of Ministers Life is in interstate commerce pursuant to the *South-Eastern Underwriters Case*. I believe that *Todd* and *Benn* demonstrate that the McCarran Act did not give the states the power which the majority opinion utilizes to sustain the constitutionality of sec. 201.42, Stats.